FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ NOV 04 2011 ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
CA, Inc.,

                              Plaintiff,                          **04-CV-2697 (TCP)**

          -against-
                                                                  **MEMORANDUM**
CHARLES WANG and PETER                                            **AND ORDER**
SCHWARTZ,

                              Defendants.
------------------------------------------------X
PLATT, District Judge.

          Before the Court is defendants' motion to dismiss plaintiff's Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief

may be granted.  Plaintiff's Amended Complaint requests, pursuant to Federal Rule of Civil

Procedure 60(d), that final judgment in the previously settled cases[1] be overturned to the extent

that defendants Wang and Schwartz were granted releases.

          As set forth in greater detail below, plaintiff's request pursuant to Rule 60(d) is denied

because plaintiff contributed to the situation from which it now seeks relief.  In addition, plaintiff

has not demonstrated that defendants perpetrated a fraud upon the Court.  With regard to

defendants' motion to dismiss the claims in plaintiff's amended complaint, defendants have

demonstrated that they were released from those claims pursuant to CA's global settlement with

its shareholders.  Accordingly, plaintiff's request for 60(d) relief is hereby **DENIED** and

defendants' motion to dismiss is hereby **GRANTED**.

---

1.  *See* EDNY docket number 98-CV-4839 at entry 175 (Amended Order and Final Judgment as to CA defendants
filed December 16, 2003).

# I. BACKGROUND

## A.     Facts

### 1.     The Parties

Plaintiff CA, Inc. ("CA") is a public corporation organized under Delaware law with its headquarters and principal place of business located at One CA Plaza, Islandia, New York. The company was founded in 1976 and is one of the world's largest providers of information technology management software. At all times relevant to this action, CA's fiscal year began April 1 and ended March 31.[2] Am. Compl. ¶ 8.

Defendant Charles Wang ("Wang") co-founded CA in 1976 and served as its Chief Executive Officer ("CEO") from June 1976 until August 2000 and its Chairman of the Board from April 1980 through November 15, 2002. *Id.* at ¶ 9. Defendant Peter Schwartz ("Schwartz"), a certified public accountant, served as Vice President in CA's Finance Department from 1983 until 1985. He became CA's Chief Financial Officer ("CFO") in 1985 and held that position until June 22, 1998 when he resigned. Following his resignation as CFO, Schwartz continued to work at CA in an untitled executive officer position through the summer of 1998. Thereafter, Schwartz served as a paid consultant to CA on accounting matters through March 31, 2003. *Id.* at ¶ 10.

### 2.     The Government and Audit Committee Investigations

In February 2002, the Securities and Exchange Commission (SEC") and the United States

---

2. The facts are taken from plaintiff's amended complaint. Although defendants do not expressly state that the instant motion is brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court shall presume that they are moving to dismiss the complaint on the grounds that it fails to state a claim upon which relief may be granted based, *inter alia*, on the *Federman* releases. Accordingly, the Court will apply the standards applicable to a Rule 12(b)(6) motion and accept as true the allegations in the complaint to the extent they contain plausible facts.

Attorney's Office ("USAO") commenced investigations into CA's accounting practices, including whether CA had engaged in a practice of prematurely recognizing revenue. In July 2003, CA's Board of Directors' Audit Committee began investigating CA's accounting practices. *Id.* at ¶ 11.

On April 26, 2004, the Audit Committee announced that CA would restate its earnings for its fiscal years 2000 and 2001 by $2.2 billion as a result of its discovery that a substantial number of CA's contracts for those years had been signed by customers after the end of the quarter in which the revenue associated with the contract had been recognized. CA's amended complaint contends that the Audit Committee did not uncover defendants' role in the alleged fraud due to their active concealment. *Id.* at ¶ 12.

On September 24, 2004, CA entered into a deferred prosecution agreement ("DPA") with the USAO. On September 28, 2004, the United States Court for the Eastern District of New York entered a Final Consent Judgment, which resolved the SEC's concurrent civil enforcement action against CA. The DPA and Final Consent Judgment required CA to establish a $225 million restitution fund to compensate CA's shareholders for injuries resulting from the 35-Day Month practice. CA also agreed to cooperate fully with the government's ongoing investigations into the accounting misconduct and cover-up committed by certain former CA executives. *Id.* at ¶ 13.

### 3.       The Special Litigation Committee's Investigation

In 2004, separate derivative complaints were filed by three CA shareholders. In October 2004, the Court consolidated these three actions under the caption *Computer Associates International, Inc. Derivative Litigation*, 04-CV-2697 (E.D.N.Y.). On January 7, 2005, the three

shareholders filed a consolidated amended complaint ("consolidated complaint") seeking, on behalf of CA, damages from twenty-two (22) current and former CA directors, officers and employees, including Wang and Schwartz, for injuries caused to CA by their engaging in and covering up the accounting fraud that led to CA's April 26, 2004 restatement. The consolidated complaint also asserted claims against CA's current and former independent auditors. *Id.* at ¶ 14.

On February 1, 2005, CA's Board established a Special Litigation Committee ("SLC"), which was given the authority to investigate the allegations of wrongdoing asserted in the consolidated complaint and to determine CA's response. Prior to the SLC conducting any substantive investigatory work, the USAO requested that the SLC refrain from interviewing any witnesses until it concluded its criminal prosecution of Sanjay Kumar, Wang's protégée and the man who replaced him as CA's CEO in August 2000 and of Stephen Richards, the former head of CA's Worldwide Sales Department. The SLC agreed. *Id.* at ¶ 15.

On April 24, 2006, the USAO concluded its criminal prosecution when Kumar and Richards each pled guilty to eight counts of securities fraud, obstruction of justice, conspiracy to commit securities fraud and to obstruct justice, false SEC filings and certain other criminal charges. Two days later, the USAO advised the SLC that it no longer objected to it conducting interviews. The SLC then began its substantive investigation. *Id.* at ¶ 16.

### 4. Facts Uncovered by the SLC

On April 13, 2007, the SLC issued two comprehensive reports, totaling nearly 450 pages. The first report addressed the claims against the twenty-two individual defendants and the other report concerned the claims against CA's current and former independent auditors. *Id.* at ¶ 18. As a result of the reports, the SLC concluded that it was in the best interests of CA and its

-4-

shareholders to bring the claims asserted herein against Wang and Schwartz. *Id.* at ¶ 19.

### a.   *CA's Revenue and Earnings*

At the beginning of each fiscal quarter, CA publicly issued an estimate of the revenue it expected to earn during that quarter. Based on that estimate, Wall Street stock analysts estimated what they believed would be CA's earnings-per-share of CA stock for the quarter. The average of these estimates is commonly referred to as the "consensus" earnings estimate. *Id.* at ¶ 21.

CA's income was derived primarily from licencing software and providing maintenance for that software. CA's software contacts typically charged customers (a) license fees and (b) maintenance fees for technical support, such as customer service, telephone assistance and bug fixes. If the total contract fee was not expressly apportioned between the licence and maintenance fees, CA, for its internal accounting purposes, typically apportioned 80% of the total contract value to the licence fee and 20% to the maintenance fee. *Id.* at ¶ 22.

Before revenue could properly be realized by CA in a given fiscal quarter pursuant to generally accepted accounting principles ("GAAP"), the contract had to be signed by the customer prior to the close of that calendar quarter. Although most customers negotiated contract terms allowing them to pay contract fees in annual installments, pursuant to GAAP, CA was permitted to record the present value of the revenue from the licence fee component of the contract up front for the quarter in which the contract was signed. Given that each copy of the software, beyond the original, cost little to produce incrementally, a large portion of the revenue from a contract went directly to CA's bottom line. As a result, finalizing one large contract could substantially aid CA in meeting the consensus earnings for a quarter. *Id.* at ¶ 23.

b.    *Defendants' Alleged Participation in the 35-Day Month Practice*

The amended complaint alleges that the 35-Day Month practice was in place at CA by at least 1984 because of Wang, the originator of the practice and its dominant guiding force.  Under Wang's leadership, CA engaged in the practice of attempting to hit or surpass Wall Street analysts' consensus earnings estimates because failure to meet or exceed the estimates in any given quarter could result in a decrease in the value of the company's stock.  *Id.* at ¶ 24.

Wang and Schwartz caused CA to violate GAAP by recognizing licence revenue in one quarter from contracts actually signed by the customer and/or CA in the following quarter. Contracts were backdated to make it appear as if the customers and CA signed the contracts by the end of the quarter.  Consequently, filings made by CA with the SEC were materially inaccurate and included financial statements which did not fairly represent CA's financial condition in accordance with GAAP.  *Id.* at ¶ 25.

Wang and Schwartz held meetings with other members of senior CA management after the end of each quarter to size up CA's sales and determine whether they were sufficient to meet consensus earnings estimates for the quarter.  If they were insufficient, Schwartz, at Wang's direction, "extended" the quarter, i.e., kept "the books open," by a few days into the next calendar quarter so that the sales force could finalize additional sales.  *Id.* at ¶¶ 27-29.  Schwartz also told members of CA's sales force to backdate their signatures and to ask customers to backdate their signatures to make it appear as though both had signed by the end of the quarter to conceal the 35-Day Month practice from outside auditors.  *Id.* at ¶ 30.  Defendants also used "preprinted" signature date blocks to make it appear that the contracts were executed in the prior quarter and instructed sales accounting personnel to use white-out to conceal actual dates and

-6-

times on documents sent via facsimile. *Id.* at ¶¶ 31, 32.

When CA employees in its legal department had a question about a non-standard term in a contract, Schwartz, although well aware that the contact had not been signed in the previous quarter, would direct that the revenue be recognized in the prior quarter. Wang was aware of this practice and condoned it. *Id.* at ¶ 33. Throughout the first few days of the new quarter, Wang and Schwartz would monitor CA's revenue from the prior quarter. A quarter would only close once CA recognized enough revenue to meet the consensus earning estimate, typically three to five days after the calendar end of a quarter, but longer if necessary. *Id.* at ¶ 34.

### c.    *Specific Examples of Defendants' Alleged Fraud*

Plaintiff's amended complaint details specific examples of defendants' alleged fraud, an outline of which follows:

(1) CA recognized approximately $43 million in revenue from a contract with Fiat in the quarter ending December 1996 despite the deal being finalized on or about January 8, 1997.

(2) Revenue from contracts signed in early April 1997 was recognized in the March 1997 quarter.

(3) Revenue from contracts executed in July 1997 was recognized in the June 1997 quarter.

(4) In September 1998, Wang caused CA to enter into a revenue swap agreement with HBO & Company which Wang intended to recognize to meet CA's September 1998 consensus earning estimate for the quarter and recognized revenue from contracts signed after the close of the September 1998 quarter.

(5)(a) On March 29, 1999, CA announced that it had entered into an agreement to acquire Platinum Technology International, Inc. The transaction closed May 28, 1999 although Wang personally directed Platinum employees to "backdate and "wrong date" contracts so that revenue could be recognized in the quarter of his choosing.

(b) On or about April 6, 1999, CA and Exxon agreed on the terms of a deal, but

the deal did not close after Exxon's representatives refused to backdate the contract to March 31, 1999. Nor did Wang take any action to stop the backdating after being advised by a senior Exxon representative that Wang's sales agent asked Exxon to backdate the contract.

(6) In CA's fiscal year 2000, which ran from April 1, 1999 to March 31, 2000, Wang caused CA to improperly recognize revenue from at least seventy contracts, with an aggregate GAAP value of $1.2 billion. For the first quarter, he caused CA to prematurely recognize at least $122 million of revenue (approximately 10% of the total revenue for the quarter); for the second quarter, at least $468 million of revenue (approximately 29% of total revenue for the quarter); for the third quarter, at least $404 million of revenue (approximately 22% of total revenue for the quarter); and for the fourth quarter, at least $199 million of revenue (approximately 9.3% of the total revenue for the quarter).

(7) On June 28, 2000, CA entered into an agreement to purchase "software technology" from Enterprise Management Systems, Inc. ("EMS"), a joint-venture partner of CA's located in Taiwan, for $24 million. On June 30, 2000, the original source code license agreement, which was signed in April 2000 and backdated to March 2000, was modified and required EMS to pay an additional license fee of $18.5 million in addition to the $5 million paid pursuant to the original agreement, bringing EMS's total to $23.5 million for software it neither needed or used.

*Id.* at ¶¶ 35-86.

### 5. Alleged Payoff to Conceal the Fraud

On May 14, 2002, shortly after the government investigation of CA became public, a recently terminated CA employee in Hong Kong communicated with Kumar via electronic mail ("email") to advise him that EMS had made a "SIGNIFICANT CONTRIBUTION" to help "CA and its executive management" meet CA's consensus earnings estimate for the quarter ending March 31, 2000. The former employee asked for severance pay over and above what he had already received from CA. Kumar forwarded the email to one of Wang's secretaries and advised her that the email was "for Charles." Wang's secretary advised Kumar that she would "pass this to Charles" and that he knew "this guy VERY well." *Id.* at 87. Wang subsequently directed

-8-

Kumar to "settle" the severance issue with the former employee to ensure that he or she remained silent about the April 2000 deal that was "accelerated" into the March quarter and about the June 2000 revenue swap. Although Kumar asked CA's general counsel to settle with the former employee, no settlement had been finalized as of February 2003. *Id.* at ¶ 88.

In February 2003, EMS's president told Kumar and Ira Zar, CA's former Chief Financial Officer, that he had been in contact with the former CA-Hong Kong employee and that unless both were adequately compensated by CA, they would speak to the press about the "favor" EMS did for Wang. Kumar immediately arranged for CA's then general counsel and senior vice president of CA's business development department to meet with EMS's president and the former employee to discuss the terms of a deal which would buy their silence. *Id.* at ¶ 89. On or about April 17, 2003, CA's representatives agreed to pay EMS's president and the former employee a total of $4.3 million to buy their silence. *Id.* at ¶ 90.

### 6.    Release Obtained by Fraud

The amended complaint alleges that Wang initiated a massive cover-up of the accounting fraud by lying, and by directing others to lie, to CA's Board, Audit Committee and its lawyers, government investigators, CA's auditors as well as the public about defendants' knowledge of and participation in the 35-Day Month practice and sham revenue swaps. At no time did Wang or Schwartz disclose to the Board: (a) that they participated in the 35-Day Month practice and sham revenue swaps; (b) that they were aware of the existence of the fraud; or © that CA had engaged in the fraud for years. *Id.* at ¶ 91. As a result of their concealment, Wang and Schwartz each obtained a release from liability from CA in December 2003. *Id.* at ¶ 92.

### a. *The December 2003 Federman Settlement and Release*

On April 25, 2002, CA shareholder Charles Federman filed a derivative action in Delaware Chancery Court which named nine of CA's current and former directors, officers and employees as defendants, including Wang. The complaint alleged that defendants breached their fiduciary duties to the company by causing it to engage in accounting practices which violated GAAP. On August 25, 2003, the parties to the Delaware action agreed to settle it. On that date and in order to facilitate the settlement, Federman filed a shareholder derivative action in this Court, which incorporated the allegations from the Delaware action, captioned *Federman v. Artzt*, 03-CV-4199 (E.D.N.Y.). *Id.* at ¶ 93.

On December 11, 2003, the undersigned entered an Order approving the settlement of the *Federman* action. Pursuant to the terms of that Order, the "Settled Derivative Claims" were "compromised settled, released, discharged and dismissed" as against all then-current and former officers and directors of CA, including Wang and Schwartz. "Settled Derivative Claims" was defined as claims relating to CA's past accounting practices "for breach of fiduciary duty, breach of CA's policies or procedures, waste, mismanagement, violations of law, money damages or other relief." *Id.* at ¶ 94. In April 2007, CA's SLC concluded that at the time the release was granted in December 2003, defendants had actively concealed their participation in the 35-Day Month practice and revenue swaps.[3] *Id.* at ¶ 95.

### b. *Defendants' Allegedly Active Concealment of the Fraud*

On April 29, 2001, the *New York Times* published an article entitled "A Software Company Runs Out of Tricks: The Past May Haunt Computer Associates." The article contained

---

3. The alleged existence of any fraud or active concealment was never before the Court until the present case.

the following statement: "Computer Associates, they [former employees and independent industry analysts] say, has used accounting tricks to systemically overstate its revenue and profits for years. The practices were so widespread that employees joked that C.A. stood for "Creative Accounting," and that March, June, September and December, when fiscal quarters end, had 35 days, giving the company extra time to close sales and book revenue." *Id.* at ¶ 96. At a May 7, 2001 meeting with CA's Board of Directors to discuss the April 29th article, Wang lied by telling the Board that there was nothing to support article's allegations and that they were unfounded. *Id.* at ¶ 97.

In February 2002, when the government investigation of CA first began, a CA director asked Wang whether CA's accounting had been done "honest[ly]." Wang responded by stating: "I hope so." Wang knew that billions of dollars of CA revenue had been fraudulently recognized in accordance with the fraudulent revenue swaps and the 35-Day Month practice which he directed. *Id.* at ¶ 98. On February 21, 2002 and during a meeting of CA's Board of Directors to discuss the government investigation, Wang lied by telling the Board that the government's allegations "were immaterial." *Id.* at ¶ 99.

In May 2002, Wang instructed Kumar to "stall" and "stonewall" the government and to "play hardball" with government investigators. Wang told Kumar that it would be, and others would view it as, an extreme act of disloyalty for Kumar to disclose the fraud to the government or CA's Board. At Wang's direction, Kumar directed members of senior management to remain silent about the fraud. *Id.* at ¶ 100.

On May 14, 2002, at a meeting of CA's Board of Directors, members of the Board asked Wang and Kumar whether there was any merit to the government's allegations against CA.

Wang remained silent and said nothing in response. At no time did he reveal his knowledge and/or involvement in the accounting fraud. *Id.* at ¶ 101. During an October 22, 2002 Board meeting, Wang told the Board that "CA had good quarter-end cut off procedures in place" which were "adequate." *Id.* at ¶ 102. In November 2002, during a conversation between Wang and Kumar, Wang dismissed and downplayed the 35-Day Month practice by referring to it as "an old problem" and Wang told Kumar that if Kumar were to disclose the accounting fraud to the government, the government would ruin CA. *Id.* at ¶ 103. From February 2002, when the government investigation began, through December 2003, when the *Federman* release was obtained through fraud, the government investigation was discussed at every meeting of CA's Board of Directors.

Wang was present at each Board meeting (except for the meeting held on June 21, 2002) from February 2002 through November 2002, when he retired as CA's Chairman of the Board. Wang never disclosed to the Board: (a) that he directed the 35-Day Month practice and sham revenue swaps; (b) that he was aware of the existence of the fraud; and © that CA had engaged in the fraud for years. Instead, he lied to directors by assuring them that CA had done nothing wrong and by denying the government's allegations that CA had engaged in the accounting fraud. *Id.* at ¶ 104.

During the CA Audit Committee's investigation, the Audit Committee and its counsel interviewed Wang concerning his knowledge of the accounting fraud it and the government were investigating. Wang did not disclose to the Audit Committee or its counsel that he was aware of the 35-Day Month practice or revenue swaps or that he had participated in them. Furthermore, he lied by denying that he participated in the fraud. *Id.* at ¶ 105.

-12-

During the government investigation, CA's counsel interviewed Schwartz concerning his knowledge of the accounting fraud being investigated by the government. Wang did not disclose to CA's counsel that he was aware of the 35-Day Month practice or revenue swaps and denied that any fraud had occurred. *Id.* at ¶ 106.

On July 23, 2003, less than five months before the *Federman* settlement was approved and while CA's Board was considering whether the company should grant releases to its current and former directors and officers, Wang's lawyers told the company's lawyers that Wang must receive a full release in connection with the settlement. *Id.* at ¶ 107. On August 18, 2003, less than four months before the Court approved the *Federman* settlement, when CA's Board was considering whether the company should grant releases to its current and former directors and officers, Wang took the extraordinary step of causing his lawyers to send a memorandum to the lawyer for the CA directors, who were considering whether to settle the *Federman* action, to grant Wang a release. In the memorandum, Wang, through his lawyers, advocated and exhorted that he should be given a full release in connection with the settlement, and he falsely and fraudulently told the CA directors' counsel that "CA's Board has no real basis for believing any wrongdoing will be uncovered" and that "[CA's] interests and those of the individual defendants," including Wang, were identical." Moreover, Wang's lawyers stated that "there is a remote chance that evidence of wrongdoing would be uncovered" and "no evidence of wrongdoing by the individual defendants has come to light," but failed to mention that nothing had surfaced because Wang was actively and fraudulently concealing the evidence of wrongdoing. *Id.* at ¶ 108. Prior to the SLC's investigation, CA and CA's independent directors did not uncover defendants' fraud because of their active and fraudulent concealment. *Id.* at ¶

-13-

109.

### c. *Ruling Purportedly Rejecting the Federman Release as a Defense to CA's Claims*

On December 14, 2009, CA moved to realign itself as plaintiff in this action so that it

could be in a position to prosecute its claims against Wang and Schwartz.  In connection with

that motion, CA argued that the *Federman* release should not operate as a bar to CA's claims in

this action.  Wang and Schwartz argued that CA's realignment motion should be denied because

of the existence of the release.  *Id.* at ¶ 110.  On October 1, 2010, CA's motion for realignment

was granted which, plaintiff contends, implicitly rejected defendants' argument that the

*Federman* release operated as a bar to CA's claims against them in this action.  *Id.* at ¶ 111.

### d. *The Amended Complaint's Request for Rule 60(d)(1) Relief*

Plaintiff's amended complaint submits that even if the Court did not reject the release

argument in deciding the realignment motion: (a) this action constitutes an independent action to

overturn the release pursuant to Federal Rule of Civil Procedure ("FRCP") 60(d)(1); (b) CA has

no other available or adequate remedy available to it to overturn the release other than through

the instant independent action; © CA's own fault, neglect or carelessness did not create the

situation for which it now seeks equitable relief under Rule 60(d)(1), but rather, defendants'

active concealment of their involvement in the fraud prevented CA from uncovering it prior to

the SLC's investigation; and (d) a grave miscarriage of justice will result if the release is not

overturned as to Wang and Schwartz.  *Id.* at ¶ 112.

### B.     Plaintiff's Claims

Plaintiff's first claim against Wang and Schwartz is for breach of fiduciary duty based on

its allegations that defendants knowingly: (a) engaged in, and caused the company to engage in,

-14-

accounting practices which violated GAAP; (b) artificially inflated the company's earnings, revenues and stock price; and © covered up their involvement in the accounting fraud by lying, failing to disclose and by encouraging others to lie and fail to disclose to CA's Board, CA's Audit Committee and/or the lawyers for CA and its Audit Committee their involvement in the accounting fraud. *Id.* at ¶ 128. Plaintiff also asserts a claim for restitution and unjust enrichment based on the allegation that defendants received from CA salaries, bonuses and other undeserved compensation during the time they were engaged in the accounting fraud and cover-up. *Id.* at ¶ 133.

As a third claim, plaintiff alleges fraud on the grounds that defendants each owed to CA a duty not to engage in accounting practices that knowingly violated GAAP, not to intentionally inflate CA's earnings, revenue and stock price and not to purposefully cover up their wrongdoing. Plaintiff also contends that defendants owed CA a duty of full disclosure of information related to CA's accounting practices, revenue recognition and financial results and that defendants breached said duties. *Id.* at ¶¶ 136, 137.

As to Wang, plaintiff states a claim for violation of § 14(a) of the Securities Exchange Act of 1934 based on the allegation that Wang caused CA to file a materially false and misleading proxy statement which solicited shareholder approval of CA's 2002 Incentive Plan. *Id.* at ¶ 140. Claim five, against Wang and Schwartz, seeks indemnification on behalf of CA and contends that defendants are jointly and severally liable. *Id.* at ¶ 144. Finally, plaintiff claims that Wang caused the company to waste corporate assets by authorizing payments of undeserved compensation to CA's senior management. *Id.* at ¶ 147.

## II. DISCUSSION

**A.     Legal Standard**

When considering a motion to dismiss a complaint for failure to state a claim, the court

must assume as true all allegations contained in the complaint. *Chance v. Armstrong*, 143 F.3d

698, 701 (2d Cir. 1998).  However, it is "well settled that conclusory allegations merely stating

general legal conclusions necessary to prevail on the merits of a claim, unsupported by factual

averments will not be accepted as true." *ECOR Solutions, Inc. v. Malcolm Pirnie, Inc.*, No. 02

Civ. 1103, 2005 WL 1843253, at *3 (N.D.N.Y. July 29, 2005).  The Supreme Court has held that

a "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  On FRCP 12(b)(6) motions, the

court must assess the legal feasibility of the complaint and whether a plaintiff has pled claims for

which he or she is entitled to discovery. *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000); *Chance*,

143 F.3d at 701.

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), the Supreme Court held that courts

should entertain a motion to dismiss by following a two-pronged approach:

> [A] court considering a motion to dismiss can choose to begin by identifying
> pleadings that, because they are no more than conclusions, are not entitled to the
> assumption of truth. While legal conclusions can provide the framework of a
> complaint, they must be supported by factual allegations. When there are well-
> pleaded factual allegations, a court should assume their veracity and then
> determine whether they plausibly give rise to an entitlement to relief.

In addition, the Federal Rules of Civil Procedure require a "short plain statement of the

claim showing that the pleader is entitled to relief." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).  Rule 8(a)(2) requires that a pleading

set forth facts that the pleader is entitled to relief and provide a defendant with fair notice.

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168

(1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

**B.     By Realigning CA as Plaintiff, the Court Did Not Implicitly Determine that the**
**        *Federman* Release is Void**

Plaintiff contends that by granting its motion and realigning it as plaintiff, the Court

implicitly rejected defendants' argument that the *Federman* release operated as a bar to CA's

claims against them in the instant action. Am. Compl. ¶ 111.  In affirming the global settlement,

which contains the releases at issue, the Second Circuit Court of Appeals held that if "Computer

Associates renews its motion to realign, the court should then consider the merits of permitting

realignment and permitting the corporation to pursue or dismiss various claims, consistent with

the best interests of the shareholders." *Federman v. Artzt*, 339 F. App'x 31, 35 (2d Cir. 2009).

Pursuant to Delaware's corporation law, in the instance of a lawsuit brought by a

derivative stockholder, realignment of the corporation as plaintiff "is appropriate as long as there

is no 'hint of collusion between the corporation and the defendants to the suit or evidence that the

corporation may not prosecute the action in good faith.' " *Bluth v. Bellow*, 1987 WL 9369, at \*3

(Del. Ch. Apr. 9, 1987) (quoting *In Re Penn Central Securities Litigation,* 335 F. Supp. 1026,

1040 (E.D. Pa. 1971)).  *See also Kaplan v. Wyatt*, 499 A.2d 1184, 1191 (Del. 1985) (independent

committee which conducts its own thorough investigation may properly move to dismiss

shareholder's suit); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786 (Del. 1981) (holding that a

Board may delegate its power to an independent, disinterested committee which can "properly

act for the corporation to move to dismiss derivative litigation that is believed to be detrimental

to the corporation's best interest").

Having established to the Court's satisfaction that CA was independent and disinterested, its motion for realignment, made through the Special Litigation Committee of CA's Board of Directors, was granted by Order dated September 29, 2010. DE 271. By that Order, certain claims asserted in the Consolidated Stockholders Derivative Complaint (DE 54) were dismissed with prejudice and CA was realigned as plaintiff to enter into certain settlements and to pursue claims against Wang and Schwartz.

Nothing in the Order, however, prevents Wang and Schwartz from asserting that the *Federman* releases bar CA's claims against them. Indeed, as defendants point out, CA argued the following in support of its motion for realignment:

> [A]ny affirmative defense Wang may seek to interpose, including the defense of a release, has no bearing on the issue of realignment . . . and should play no part in this Court's determination of the motion to dismiss and realign. . . . [I]f CA is realigned as plaintiff, Wang may then raise any of his defenses in his answer to the company's amended complaint or in a motion to dismiss or for judgment on the pleadings under Rules 12(b)(6) and 12©, Fed. R. Civ. P. That is the correct procedure.

Mem. in Supp. at p. 11; DE 247 at p. 21.

Thus, by permitting realignment, the Order did not implicitly determine that plaintiff could proceed against defendants despite the existence of the releases. Accordingly, nothing in the Order permitting realignment bars defendants from asserting their releases as defenses against CA's claims.

**C.  CA's Request for Relief from Judgment  Pursuant to Federal Rule of Civil Procedure 60(d)(1)**

Federal Rule of Civil Procedure 60(d)(1) provides that a court has the power to "entertain an independent action to relieve a party from a judgment, order or proceeding." "To obtain

equitable relief through an independent action under Rule 60(d), a claimant must "(1) show that [it has] no other available or adequate remedy; (2) demonstrate that [its] own fault, neglect, or carelessness did not create the situation for which [it] seek[s] equitable relief; and (3) establish a recognized ground-such as fraud, accident, or mistake-for the equitable relief.' " *Linkco, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180, 182 (2d Cir. 2010) (quoting *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2d Cir. 1997)). A motion for Rule 60(d) relief will be granted only "to prevent a grave miscarriage of justice." *United States v. Beggerly*, 524 U.S. 38, 47 (1998).

### 1.   No Available or Adequate Remedy

Given the final judgment arising out of the settlement agreement, the denial of the FRCP 60(b) motions brought by some plaintiffs in the settled cases, the Second Circuit's affirmance of those denials and that more than one year has passed since entry of final judgment, plaintiff has sufficiently demonstrated that its only available avenue of relief from the releases contained in said judgment is pursuant to Rule 60(d).

### 2.   Whether Plaintiff's Conduct Created the Situation From Which It Seeks Relief

"In this type of action, it is fundamental that equity will not grant relief if the complaining party 'has, or by exercising proper diligence would have had, an adequate remedy at law, or by proceedings in the original action . . . to open, vacate, modify, or otherwise obtain relief against, the judgment.' " *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 71 (2d Cir. 1990) (quoting *Winfield Assoc., Inc. v. Stonecipher*, 429 F.2d 1087, 1090 (10th Cir. 1970)). Thus, a plaintiff must demonstrate "the absence of fault or negligence" on its part. *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 79 (5th Cir. 1970).

A review of the SLC's report, dated April 13, 2007, shows the following:

> At a July 2, 2003 telephonic CA Board Meeting, . . . [t]he Board was told the government had rejected . . . attempts to persuade the government that any improperly-booked contracts were the result of "isolated" mistakes, and "refused to discuss a settlement";
>
> [I]n rejecting [CA's] settlement offer, both the USAO and SEC *assert[ed] that they believed that senior management of the company had intentionally held quarters open and used backdated contracts to meet earnings estimates*" (emphasis in original);

Am. Compl., Exh. A at pp. 220-21. At the July 2, 2003 meeting, the Board unanimously resolved to authorize the Audit Committee to conduct an investigation into CA's accounting practices. *Id.* at p. 223. During a July 22, 2003 Board meeting, the Board was advised that a proposed civil settlement now included a potential cash component if CA's stock dropped below a certain level. The cash component was requested by plaintiffs and "resulted from the uncertainty of the government investigation." *Id.* at p. 224.

On July 24, 2003, David Nachman, outside counsel for CA, spoke by telephone with Melvyn Weiss, lead counsel to plaintiffs in the class actions, and advised him that the government's investigation of CA's accounting practices was continuing but that the government "was now focused on the timing of CA's revenue recognition during CA's fiscal year 2000." *Id.* On the following day, the parties advised the undersigned that "they had agreed, subject to CA Board approval, to a global settlement." *Id.* at pp. 224-25. Nachman further advised the Court that although the company had been successful in addressing many of the government's concerns, "*there were certain issues–not even those initially raised, and not those specifically raised in this litigation–that remained [the] subject of intense government scrutiny.*" *Id.* at p.

-20-

225 (emphasis in original). Nachman also advised the Court that "there was no way to predict the outcome of the government investigation with certainty, which is why the plaintiffs had requested 'down-side protection' (the cash component) in the initially all-stock settlement." *Id.*

On August 4, 2003, the CA's Audit Committee's counsel met with representatives of the USAO and the SEC. At that meeting, the government advised the Audit Committee's counsel that it "had evidence demonstrating that the Company and its senior managers had engaged in the 35-Day Month practice to falsely represent the Company's quarterly financial reports." *Id.* at p. 226.

On August 7, 2003, a one-page memorandum reporting on the August 4 meeting was sent to the Board, stating: "*the government explained that it believed that the company had engaged in a systematic practice of backdating license agreements. This is what the government refers to as the '35 day month.' " Id.* (emphasis in original). The memorandum further stated that the government believed "*that senior members of the company (both current and former) had directed this practice and that it was done with the specific intent to represent falsely the company's quarterly revenues." Id.* (emphasis in original).

In preparation for August 19, 2003 meeting with the committee for the derivative settlement, retained attorney James McGuire communicated with Nachman, who was "emphatic with Mr. McGuire that he believed the settlement of the class action and derivative litigations was a 'global' deal, and that it was probable that the settlement would collapse if the releases, which would run from the Company to its officers and directors, were limited or altered in any respect." *Id.* at p. 229. McGuire also discussed the possibility of limiting the scope of the releases in the derivative settlement with CA's counsel. Nachman advised McGuire that, in his

-21-

opinion, "it would be within the Board's business judgment to grant full global releases notwithstanding the Audit Committee investigation." *Id.* at p. 230.

During the course of the investigation, the Board was repeatedly advised by counsel, that it "was unlikely that CA could resolve the government investigation unless the civil litigation was first settled." *Id.* Thus, despite mounting evidence that something was terribly awry with CA's accounting practices, the Board approved the settlement after discussions with the class action and derivative suit committees on August 21, 2003. *Id.* at pp. 237-38.

At the August 27, 2003 annual CA Board meeting, and before the settlements were preliminarily approved by the Court, the Audit Committee's counsel made his first presentation to the full Board. Notes from that meeting "reflect that he gave a decidedly negative report: "Government's Attitudes: Evidence of tens of millions of post quarter transaction bookings; backdated contracts [included in revenue] and earnings; Inadequate response to discovery requests; No question on Mis-Booking–only on [how] high up the management chain; they are more aggressive & emphatic." *Id.* at p. 238. The SLC's report points out that "[d]espite this report and . . . the many other events that would occur, and facts that would be uncovered during the Audit Committee investigation before the settlement was finally approved on December 8, 2003, no director ever questioned, or reconsidered, whether it remained in the Company's best interest to grant releases to all of CA's officers and directors." *Id.*

At an October 7, 2003 Board meeting, the Board was advised that the Audit Committee had determined that CA "prematurely recognized revenue from 'a number of software contracts' during fiscal year 2000." *Id.* at p. 258. "As one Board member told the SLC, he was in a 'state of shock' over the revelation." *Id.* at p. 259. The next day, the company issued a press release

announcing the preliminary results of the Audit Committee's investigation, including its determination that CA recognized certain revenue prematurely in the fiscal year ending March 31, 2000. *Id.* at p. 260. Wang last served the company as CEO in 2000.

The Board met again on December 3, 2003 with regard to the settlement, i.e., two days before the fairness hearing was due to be conducted. At the time, the Board was advised of the following: (1) that two additional CA executives had been terminated from CA because they refused to be interviewed by the Audit Committee; (2) that another executive asserted his Fifth Amendment rights during an interview with the SEC; and (3) that the Audit Committee was now investigating charges of obstruction. *Id.* at p. 271. On December 5, 2003, the Court held the fairness hearing and, on December 8, 2003, issued Orders approving the settlement.

CA argues that none of the evidence that had come to light by December 2003 concerned Wang or Schwartz "precisely because they were actively and intentionally hiding their wrongdoing from the company." Mem. in Opp. at p. 16. Plaintiff contends that Wang never used email or otherwise communicated about the fraud in writing. Instead, he preferred one-on-one communications, primarily with Kumar, so his involvement with the fraud would not be discovered. Once the government and Audit Committee investigations began, according to plaintiff, Wang and Schwartz lied to the CA Board as well as CA's and the Audit Committee's lawyers when questioned about the fraud and directed others to "stonewall" government investigators, all prior to December 2003. CA claims that a $4.3 million payment from CA's coffers bought a former CA's employee's silence and ensured that Wang's involvement in the fraud remained hidden. CA professes that it "did not have its blinders on; Wang and Schwartz were blindfolding the company." *Id.* at 17.

-23-

Upon review of the foregoing in the context of CA's request to partially reopen the final judgment to void Wang's and Schwartz's releases, however, it is clear that CA had a large part in the predicament from which it now seeks relief. First, it is simply not credible that CA's Board approved the releases with absolutely no inkling that Wang and Schwartz were involved in or aware of the 35-Day Month practice. This is particularly so considering their positions in the company as CEO and CFO, respectively. On October 7, 2003, the Audit Committee advised the Board that it discovered premature revenue recognition from 2000, while Wang was CEO. In fact, plaintiff's amended complaint points out that "Wang took the *extraordinary* step of causing his lawyers to send a memorandum to the lawyer for the CA directors who were considering whether to settle the Federman action and grant Wang a release." Am. Compl. ¶ 108 (emphasis added). Yet, CA claims it had no idea that Wang was concealing his part in the improper revenue recognition. Conversely, if CA's claim of a complete lack of knowledge *is* true, then its ignorance amounts to negligence.

Nor it is credible that CA's Board approved the comprehensive language in the releases based on Wang's and Schwartz's mere denials of culpability. That would be akin to a prosecutor questioning a suspect, who has the means to commit a crime, and then releasing that suspect based solely on his or her bare recital of innocence.

CA's reliance on Wang's and Schwartz's purported misrepresentations is likewise unavailing because the Board was advised numerous times, before December 2003, that backdating of contracts had occurred but that it was unknown how high up the corporate ladder the fraud went. Indeed, the SLC's report indicates that despite all of the information given to the Board, no director ever considered, prior to the approval of the settlements, whether granting

-24-

releases to the company's directors and managers remained in CA's best interests. Am. Compl., Exh. A at p. 238.

What happened in this case is that CA's Board, eager to settle CA's civil liability to save itself from the expenses and distractions of a trial as well as the potential for exposure to billions of dollars in damages, granted the releases as part of a global settlement.[4] According to the SLC's report, the global settlement would have collapsed without the releases. The purpose of a Rule 60(d) motion, however, is to relieve a party from a grave miscarriage of justice, not from one part of a bargain that the party seeking relief now views as undesirable. For the foregoing reasons, CA is unable to demonstrate that it acted without fault or negligence.

### 3.    Fraud as a Ground for Equitable Relief Pursuant to Rule 60(d)(1)

The "type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by a timely motion." *Gleason v. Jandrucko,* 860 F.2d 556, 558 (2d Cir. 1988). "Indeed, 'fraud upon the court' as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." *Id.* at 559. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238, 245-46 (1944) (setting aside a twelve-year old judgment based on evidence of a "deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals" which threatened the "very integrity of the

---

4. During the class action settlement committee meeting, the committee was advised that the risks of not going forward with the settlement included: (1) two to five billion dollar exposure; (2) if a trial were lost, a successful appeal would be unlikely in the post-Enron/WorldCom environment; (3) the continued distraction of management and costs to the company; and (4) continued pressure on CA's stock. Am. Compl., Exh. A at p. 233. Although the Board was not present at the settlement committee meetings, "[m]ost, if not all, of the directors interviewed recalled the two-to-five billion dollar figure, and that Mr. Fleming strongly advocated settling the class action."

judiciary and the proper administration of justice"). In *Hazel-Atlas*, however, the Supreme Court distinguished between "the facts of the case before it and 'a case of a judgment obtained [simply] with the aid of a witness who, on the basis of after discovered evidence, is believed possibly to have been guilty of perjury.' " *Gleason*, 860 F.2d at 559 (quoting *Hazel-Atlas Glass Co.*, 322 U.S. at 245). "The latter scenario . . . would be subject to the rule of finality, *i.e.*, that judgments generally should not be disturbed once the one-year term following their entry has expired." *Id.*

In *Gleason*, plaintiff's complaint, seeking to vacate a final judgment arising from a so ordered stipulation of settlement, alleged that two police detectives perjured themselves and intentionally concealed relevant evidence. 860 F.2d at 558. In affirming the dismissal of plaintiff's complaint pursuant to FRCP 12(b)(6), the Second Circuit held that "after discovered evidence of alleged perjury by a witness is simply not sufficient for a finding of 'fraud upon the court.' " *Id.* at 559 (quoting *Hazel-Atlas*, 322 U.S. at 245). "Similarly, allegations of nondisclosure during pretrial discovery do not constitute grounds for an independent action under [FRCP] 60(b)." *Id.* at 559-60. Recently, in *Linkco, Inc. v. Naoyuki Akikusa*, the Second Circuit reaffirmed that the Court has "observed that 'neither perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant.' " 367 F. App'x 180, 183 (2d Cir. 2010).

Even assuming, *arguendo,* that Wang and Schwartz misrepresented their knowledge of and participation in the 35-Day Month practice, such alleged fraud does not warrant the extraordinary relief available under Rule 60(d) because it is fraud upon a litigant, not upon the Court.

Prior to the fairness hearing in December 2003, the Board was repeatedly advised that the

-26-

government and the SEC were investigating the company's practice of backdating contracts. As

set forth above, the Board, despite this knowledge, agreed to enter into the global settlement of

the civil cases. The Court was not privy to the negotiations surrounding the parties' agreement.

Moreover, plaintiff had the opportunity to discover the purported fraud and misrepresentations

but chose to settle the actions. *See Gleason*, 860 F.2d at 559 ("[P]laintiff had the opportunity in

the prior proceeding to challenge the police officers' account of his arrest. . . . Instead, however,

Gleason voluntarily chose to settle the action."). Consequently, CA cannot establish fraud as an

equitable ground for relief pursuant to FRCP 60(d)(1).

In light of the fact that CA has not shown that it had no part in the circumstances from

which it now seeks relief and has not established a ground for relief under Rule 60(d)(1), the

amended complaint's request is hereby denied.

**D.      Scope of the Releases**

Turning to defendants' motion to dismiss for failure to state a claim, the stipulation in the

*Federman* action, which pertained to that action and any future suits brought by or on behalf of

CA, contains the following language:

> Upon the Effective Date of this Settlement, Plaintiff and CA shareholder,
> derivatively and on behalf of CA, and CA . . . shall, by operation of the Order and
> Final Judgment and Dismissal, release and be deemed to release and forever
> discharge, and shall forever be enjoined from prosecuting, any Settled Derivative
> Claims and/or Unknown Claims against any of the Released Parties including,
> without limitation, any claim relating to the parties [sic] entry into this Settlement.

The "Settled Derivative Claims" include:

> All claims, rights, demands, suits, matters, issues or causes of action, including
> both known and Unknown Claims, that have been or could have been asserted by

> CA or derivatively on behalf of CA in the Derivative Actions by Derivative
> Plaintiff, by CA, or by any CA shareholder against the Released Parties including,
> without limitation, claims based upon, arising out of or relating to the acts, facts
> or events alleged in the Derivative Actions, claims asserted in the Demand Letter,
> claims for breach of fiduciary duty, breach of CA's policies or procedures, waste,
> mismanagement, violations of law, money damages or other relief, claims based
> upon or relating to the claims asserted in the Securities Class Actions and claims
> based upon, arising out of or relating to this Settlement or the Settlement of the
> Securities Class Actions and ERISA Actions.

Both Wang and Schwartz are "Released Parties."

In December 2003, after the fairness hearing, the Court entered an Order approving

the global settlement.  Pursuant to the terms of the Order:

> The Settled Derivative Claims are hereby compromised, settled, released,
> discharged and dismissed as against the Released Parties on the merits and with
> prejudice . . . .

In its Brief of Appellee and Cross-Appellant before the Second Circuit Court of Appeals,

CA acknowledged that "as of December 2003, Wang and Schwartz had received releases from

the company that extended to any claims against them in connection with CA's past accounting

practices."  Dec. Schlatner, Exh. A at p. 14.  CA also acknowledged that on December 10, 2003,

this Court entered an Order approving the settlement of the class actions pursuant to which the

"plaintiff class released all of the company's then-current and former officers and directors from

claims related to CA's past accounting practices."  *Id.* at n.4.

Pursuant to New York law, "a general release 'should be interpreted to release the claims

specifically bargained for and all claims reasonably related to the bargained items.' " *St. Paul*

*Fire & Marine Ins. Co. v. Ayn Enterprises, Inc.*, No. 08 Civ. 465, 2010 WL 1645091, at * 2

(S.D.N.Y. Apr. 22, 2010) (quoting *Tarantola v. Williams*, 371 N.Y.S.2d 136, 139 (N.Y. App.

Div. 1975)).  CA's amended complaint contains claims arising from and related to CA's past accounting practices.  By CA's admission, any such claims were released in the global settlement.  Plaintiff's request to overturn the releases having been denied, defendants' motion to dismiss for failure to state a claim is, therefore, granted and CA's amended complaint against Wang and Schwartz is hereby dismissed.

### III.  CONCLUSION

For the foregoing reasons, plaintiff's request to overturn Wang's and Schwartz's releases pursuant to FRCP 60(d)(1) is hereby **DENIED**.  Defendants' motion to dismiss plaintiff's amended complaint for failure to state a claim upon which relief can be granted is hereby **GRANTED**.  The Clerk of the Court is hereby directed to close this case.

**SO ORDERED**.

Dated: November 4, 2011
  Central Islip, New York

                 /s/
              Thomas C. Platt, U.S.D.J.

-29-